180 N.J. Super. 605 (1981)
436 A.2d 110
JOSEPH A. SUMMONTE AND LAURETTA A. SUMMONTE, HIS WIFE, PLAINTIFFS,
v.
FIRST AMERICAN TITLE INSURANCE COMPANY, AND CONGRESS TITLE CORPORATION, DEFENDANTS.
Superior Court of New Jersey, Chancery Division Atlantic County.
Decided May 7, 1981.
*608 Edward C. Stokes, III for plaintiffs (Stokes & Throckmorton, attorneys).
Dennis M. Gonski for defendants.
HAINES, J.S.C.
Plaintiffs Joseph F. Summonte and Lauretta S. Summonte purchased 16 vacant lots of land from Franklin S. Radosti, Selma Radosti and Franklin Stephen Construction Company, Inc. The single deed which conveyed all 16 lots contained covenants of seisin, right to convey, right to possession and freedom from encumbrances, and further assurances. Title was insured by defendant First American Title Insurance Company ("American").
The lots were subject to the lien of a judgment against the Construction Company at the time of the purchase. Its existence was not known to the Summontes and not discovered by American; it was not excepted from the coverage of the policy. The judgment constituted a breach of the covenant of quiet possession and freedom from encumbrances contained in the deed to the Summontes. It was and is an encumbrance adversely affecting the title of all of the lots conveyed.
Simultaneously with the purchase of the lots the Summontes entered into an agreement to construct roads, drainage facilities and other improvements and then to sell the lots back to the Radostis. The agreement required the Summontes to accept a mortgage for a portion of the purchase price of each lot and contained an arrangement under which they were to act jointly *609 with the Radostis in regard to future sales of the improved lots, sharing commissions. Most of the improvements have been completed at a cost of approximately $70,000. One lot is subject to a contract for the construction of a home by the Radostis and its resale to the Summontes, for which purpose the latter have obtained a commitment for a construction mortgage. Some of the lots still owned by the Summontes but covered by the Radosti agreements are subject to further purchase contracts with third parties. Several lots have been conveyed to third parties, subject unknowingly, to the lien of the judgment.
Plaintiffs requested American, which now owns the judgment through an assignment, to remove its lien from their property by payment or release so that they could convey marketable title. American refused to do so. Instead, it demanded a conveyance of the remaining lots to it for a consideration equal to plaintiffs' sale price together with American's agreement to indemnify plaintiffs against any loss resulting from the conveyance; it claimed that its demand was authorized by the terms of the title insurance policy. Plaintiff disagreed with the claim, refused to convey the lots and brought this suit, obtaining an order to show cause why a judgment should not be entered requiring American to discharge the lien. The facts upon which their application depends are not in dispute. This opinion resolves the litigation.

I. The Policy Provisions; General Principles of Interpretation
The title insurance policy issued to plaintiffs insured them "against loss or damage ... sustained or incurred ... by reason of ... a defect in or lien or encumbrance on [their] title...." The judgment is clearly within this language. Other express language of the policy insured against claims of third-party grantees based upon a breach of covenants contained in any deeds of conveyance given by the Summontes.
American's demand for a conveyance is based in part on the following provisions of the policy:
....

*610 (c) The Company shall have the right at its own cost to institute and without undue delay prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest as insured, and the Company may take any appropriate action under the terms of this policy, whether or not it shall be liable thereunder, and shall not thereby concede liability or waive any provision of this policy.
....
(e) ... Whenever requested by the Company, such insured shall give the Company all reasonable aid in any such action or proceeding, in effecting settlement, securing evidence, obtaining witnesses, or prosecuting or defending such action or proceeding, and the Company shall reimburse such insured for any expense so incurred.
....
5. The Company shall have the option to pay or otherwise settle for or in the name of an insured claimant any claim insured against or to terminate all liability and obligations of the Company hereunder by paying or tendering payment of the amount of insurance under this policy together with any costs, attorneys' fees and expenses incurred up to the time of such payment or tender of payment, by the insured claimant and authorized by the Company.
These policy provisions, to the extent they need construction, are to be "liberally construed in favor of the insured and strictly construed against the insurer." Sandler v. N.J. Realty Title Ins. Co., 36 N.J. 471, 479 (1962). Further, they must be interpreted in a way which fulfills the reasonable expectations of the insured. Id. at 479; Kievit v. Loyal Protect. Life Ins. Co., 34 N.J. 475, 482 (1961).

II. The Principle of Indemnity
The general rule, set forth in Sandler, supra is that
A title insurance policy is a contract of indemnity under which the insurer for a valuable consideration agrees to indemnify the insured in a specified amount against loss through defects in title to, or liens or encumbrances upon realty in which the insured has an interest. [at 478]
Thus it is said that the insured may recover only "the actual loss which he has sustained by virtue of title defects, encumbrances and the like." 9 Appleman, Insurance Law and Practice (perm. ed.), "Title Insurance," § 5217 at ___. The Summontes have not yet been obliged to spend any money on account of the judgment. American therefore argues that it has no obligation respecting the lien because it has occasioned no loss. It cites *611 Palliser v. Title Ins. Co. of N.Y., 61 Misc. 490, 115 N.Y.S. 545 (Sup.Ct. 1908), to support the argument. In that case the court dealt with an encumbrance which had not been excepted from a title insurance policy issued by the defendant. It held, stressing the indemnity aspect of title insurance policies, that
... the insured ordinarily could not maintain an action for damages for breach of a contract of insurance because of the existence of an incumbrance not excepted in the policy, unless he actually suffered loss by reason of the payment or enforcement of the incumbrance. As already stated, the defendant's policy is to be regarded as a contract of indemnity. In this respect, it is analogous to a covenant in a deed against incumbrances, and therefore, subject to the rules applicable to such a covenant.
A covenant against incumbrances is treated as a contract of indemnity, and although broken as soon as made, if broken at all, nevertheless a recovery (beyond nominal damages) is confined to the actual loss sustained by the covenantee by reason of the payment or enforcement of the incumbrance against the property. He is not permitted to recover the amount of the outstanding incumbrance, before payment or loss of the property, although its existence may be an embarrassment to his title and subject him to inconvenience. [at 61 Misc. 493, 115 N.Y.S. 546; quoting from McGuckin v. Millbank, 152 N.Y. 297, 302, 46 N.E. 490, 492 (Ct.App. 1897)]
Allied Mtg. Co. v. Atlanta Title & Trust Co., 58 Ga. App. 366, 198 S.E. 310 (Ct.App. 1938), is to the same effect. The Georgia court held that a mortgagee which paid a lien affecting the mortgaged property could not recover from the insurer of title. There was no proof that the payment could not be recovered from the mortgagor, who was primarily liable. Consequently, the necessary showing of actual loss was missing.
An even harsher rule is set forth in Blessing v. American Title and Ins. Co., 121 So.2d 455 (Fla.D.Ct.App. 1960). The Florida plaintiffs were the innocent purchasers of a property subject to a judgment, not listed as an encumbrance on their title insurance policy. Upon discovering the judgment they discharged it by voluntary payment. The court held that the policy insured only actual loss not marketability, and that the insured was protected only when execution of the judgment was sought, not by voluntary satisfaction.
The Palliser court found that the plaintiff suffered no "actual loss." On the peculiar facts of that case this was true. Palliser *612 had purchased a lot subject to the lien of all taxes and assessments against the property and was bound to pay the same purchase price no matter how extensive the liens turned out to be. The title company overlooked one assessment, a circumstance which was not discovered until Palliser attempted to sell the lot. The court held that the reduction of the sale price resulting from the existence of the assessment did not reflect an actual loss to Palliser because he had agreed to purchase subject to its lien. The case is obviously distinguishable. Furthermore, it is no longer the rule in New York.
In Empire Development Co. v. Title Guar. & Trust Co., 225 N.Y. 53, 121 N.E. 468 (1918), the New York Court of Appeals reached the opposite conclusion. It held that a policy of title insurance was more than an indemnity contract and should be looked upon as a warranty or a covenant against encumbrance. The court said:
... the existence and lien of these assessments has been declared. Because under their contract the plaintiffs are compelled to pay them, their loss is no less. As is said in Foehrenbach v. German-American Title & Trust Co., 217 Pa. 331, 66 A. 561, 12 L.R.A.,N.S., 465, 118 Am.St.Rep. 916, the word `loss' is a relative term. Failure to keep what a man has or thinks he has is a loss. What the word means is to be measured by the standard accepted between the parties. As a help to our decision, we must examine the purpose and object of the contract. To a layman a search is a mystery, and the various pitfalls that may beset his title are dreaded, but unknown. To avoid a possible claim against him, to obviate the need and expense of professional advice, and the uncertainty that sometimes results even after it has been obtained, is the very purpose for which the owner seeks insurance. To say that when a defect subsequently develops he has lost nothing and, therefore, can recover nothing, is to misinterpret the intention both of the insured and the insurer. [225 N.Y. at 59, 60, 121 N.E. at 470]
See also Glickman v. Home Guar. Co., 8 Misc.2d 303, 167 N.Y.S.2d 793 (Sup.Ct. 1957).
The Blessing and Allied Mortgage cases provide very modest support for American's position. Neither discusses the indemnification rule, as such. Both state conclusions without reasons. The opinions are models of brevity without the solace of logic. They will not be followed here.
*613 Any requirement of "actual loss," examined in the light of present facts and modern decisions, is a requirement which must be read liberally, not strictly. Nothing less can result from application of the universal rules which require insurance policies to be so interpreted and, further, to be construed in a manner which satisfies the expectations of the insured. Courts, faced with the enforcement of title insurance obligations, speak of indemnification but act in broader terms. For example:
(1) In Sandler, supra, the Supreme Court permitted a recovery against the insurer when a third party invoked a paramount title "in such a manner as to leave no doubt that it will be enforced" (at 486). The insured had suffered no "actual loss"; it had not yet been deprived of the property by the third party claimant.
(2) The insured in Caravan Products Co. v. Ritchie, 55 N.J. 71 (1969), discovered that his property was subject to an encumbrance consisting of an unconfirmed municipal assessment. It was not listed as an exception by the insurer. The court noted that the policy was a contract of indemnity, quoting from Sandler, but approved the recovery of damages in the amount of the assessment without considering any question of its payment by the insured.
(3) In McMinn v. Damurjian, 105 N.J. Super. 132 (Ch.Div. 1969), plaintiff sued for the lost use of part of a side yard resulting from a survey error. Damages were allowed equalling the cost of making necessary changes in the entrance to the insured's dwelling, although that cost had not yet been paid. The court also held that "the import of the indemnification extends to the insured's title," and concluded that the insurance company had an obligation to defend that title when it was placed in dispute even though the dispute was crystallized by a law suit commenced by the insured. (At 142).
(4) In Burks v. Louisville, 95 Ohio App. 509, 121 N.E.2d 94 (Ct.App. 1953), a portion of plaintiff's property was found not to be within the boundary lines shown on a survey insured by the defendant. The insurer claimed that no "actual loss" had been suffered as a result of the error because the property had not been resold at a loss and no additional monies had been expended since the purchase was made. The court nevertheless awarded damages, refusing to recognize the defense claim. It held that the title company had an obligation to relieve the plaintiff of the title defect and breached its insurance contract when it failed to do so.
(5) Lawyers Title Ins. Corp. v. Frieder, 147 Colo. 44, 362 P.2d 555 (Sup.Ct. 1961), held that an insured could recover damages from a title company reflecting the diminution in value of his property resulting from the existence of an easement not excepted in the title policy. No actual loss was suffered; the property had not been resold, the owner of the easement had not enforced its rights and no monies had been expended as a result of the diminution in value. Overholtzer v. Northern Counties Title Ins. Co., 116 Cal. App. 113, 253 P.2d 116 (D.Ct.App. 1953), is to the same effect.
*614 In Jarchow v. Transamerica Title Ins. Co., 48 Cal. App.3d 917, 122 Cal. Rptr. 470 (D.Ct.App. 1975), the court held that the title company was liable in tort for the bad faith breach of its obligation to remove a title defect (an easement) when requested by the insured. Theories of indemnification were ignored. Damages were recovered for the loss of use of the property, for legal fees incurred in a quiet title action brought by the insured and for emotional distress. The court said:
In affirming the $200,000 judgment, we hold that when a title company insures a buyer of real property against liens and negligently fails to discover or disclose a recorded lien or encumbrance or fails to exclude a known recorded lien or encumbrance from coverage and, upon being notified of the existence of a recorded lien or encumbrance, unjustifiably refuses to take any legal action to clear the title or eliminate the cloud, the insurer may be liable to the insured in compensatory damages for any emotional distress which results. [48 Cal. App.3d at 926; 122 Cal. Rptr. at 476]
....
In determining what benefits or duties an insurer owes his insured pursuant to a contract of title insurance, the court may not look to the words of the policy alone, but must also consider the reasonable expectations of the public and the insured as to the type of service which the insurance entity holds itself out as ready to offer. Stated in another fashion, the provisions of the policy "`must be construed so as to give the insured the protection which he reasonably had a right to expect, ...'" Hence, title insurance policies must be liberally construed in favor of the insured. [48 Cal. App.3d at 491, 122 Cal. Rptr. at 487, citations omitted]
The title policy involved in Jarchow provided:
The Company, at its own cost and without undue delay shall provide (1) for the defense of the Insured in all litigation consisting of actions ... commenced against the Insured ...; or (2) for such action as may be appropriate to establish the title ... as insured, which litigation ... is founded upon an alleged defect, lien or encumbrance insured against by this policy....
The policy issued by American provided in paragraph 3(a):
The Company, at its own cost and without undue delay, shall provide for the defense of an insured in all litigation consisting of actions ... commenced against such insured....,
thereby creating a defense obligation identical to that provided in Jarchow. However, American's policy contains different language with respect to the obligation to establish title. Paragraph 3(c), quoted above and repeated here for convenience, provides:

*615 The Company shall have the right at its own cost to institute and without undue delay prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest as insured, and the Company may take any appropriate action under the terms of this policy, whether or not it shall be liable thereunder, and shall not thereby concede liability or waive any provision of this policy.
On its face, this provision requires American to establish title only at its option. However, when liberal and obligatory rules of construction are applied, the reading is different. Those rules, as we have seen, require a construction of the policy in favor of the insured and one which, as stated in Jarchow, will "give the insured the protection which he reasonably had a right to expect." This approach requires paragraphs 3(a) and 3(c) of American's policy to be read together so that the "right" to "establish the title" is a mandatory alternative to the obligation to defend. Consequently, after the company had received notice of the title defect, required by paragraph 3(b) (a subsection so positioned in the policy that it falls between the statement of the obligation to defend and the "right" to "establish title"), and no litigation had commenced requiring a defense, the insurer was obliged to remove the defect. This liberal interpretation conforms to the obvious expectation of the insured.
Paragraph 7 of the policy reinforces this interpretation:
No claim shall arise or be maintainable under this policy (a) if the Company, after having received notice of an alleged defect, lien or encumbrance insured against hereunder, by litigation or otherwise, removes such defect, lien or encumbrance or establishes the title, as insured within a reasonable time after receipt of such notice; (b) in the event of litigation until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title, as insured, as provided in paragraph 3 hereof; or (c) for liability voluntarily assumed by an insured in settling any claim or suit without prior written consent of the Company.
To paraphrase: If the company receives notice of a defect which it fails to remove within a reasonable time, a claim shall be maintainable. Were the policy not to be so read the insured would be in a very unfortunate position. They would have no right to pay the judgment voluntarily: the policy prohibits a settlement without the company's consent. They could not demand that the company defend their title: there is no litigation to defend. And they could not require the company to *616 remove the title defect. This must not have been the intention of the parties. The insurance protection would be illusory; certainly that was not the expectation of the insured. It is, however, the position maintained by American. That position is untenable. I conclude that the company had and has an obligation to remove the judgment lien. Its refusal to do so was a breach of its contract.
The facts of the instant case provide alternative and pragmatic reasons for supporting this conclusion. Plaintiffs' title was subject to a judgment, overlooked by the title company when the lots were purchased. These properties, whether valued at the time of purchase or at some other time, are worth less than they would otherwise be by the amount due on the judgment. Consequently, the insured suffered a loss immediately upon the acquisition of title and that loss was in every sense "actual." Any realistic approach to clearing the Summontes' title dictates the same conclusion. With American's consent, they may remove the lien upon their property by paying the amount due the judgment creditor; that creditor is American. This would establish the "actual loss" which American insists upon, obligating the company to reimburse its insured. The proceeding would be circuitous and unacceptable. This is a court of equity; it regards as done that which ought to be done. Martindell v. Fiduciary Counsel, 133 N.J. Eq. 408, 413 (E.&A. 1942). It will not require the plaintiffs to pay American in order to have American pay them back. American must remove the judgment lien in the first instance. Furthermore, a covenant of good faith and fair dealing is implied in all insurance contracts. In Bowler v. Fidelity Cas. Co. of N.Y., 53 N.J. 313 (1969), the court said:
Insurance policies are contracts of the utmost good faith and must be administered and performed as such by the insurer ... In all insurance contracts, particularly where the language expressing the extent of coverage may be deceptive to the ordinary layman, there is an implied covenant of good faith and fair dealing that the insurer will not do anything to injure the right of its policyholder to receive the benefits of his contract. [at 327]
See, also, Jarchow v. Transamerica Title Ins. Co., supra, 48 Cal. App.3d at 940, 122 Cal. Rptr. at 486. Any concept of fair *617 dealing requires the company to remove the title defect without insisting upon an "actual loss" as it defines that unworkable term.

III. The Insurer's Right to Acquire the Properties; Salvage
American, in the purported exercise of its rights under plaintiffs' policy, as offered to relieve them from the judgment lien by purchasing all of their lots for a price at which they have agreed to sell them and to indemnify them against any loss which they might suffer as a result of that arrangement. It claims that it may do so because it has a right of salvage. No New Jersey authority has been found dealing with that subject. 9 Appleman, Insurance Law & Practice, § 5215, n. 23.45, states that a "title insurance company has the right to protect the title it had insured and also to mitigate its damages caused by a defect in title." In addition, the same treatise, at § 5217, n. 57.25, states:
It has been held that the insurer may either pay the actual loss suffered or pay the full loss suffered, that is, the price of the property and receive the property as salvage.
Appleman relies upon Rancher's Life Ins. Co. v. Banker's Fire & Marine Ins. Co., 190 So.2d 897 (Miss.Sup.Ct. 1966), in which the insured lender foreclosed its mortgage, purchased the mortgaged property, and discovered that it had acquired only a leasehold, the fee being owned by the State of Mississippi. Its debt was $3,500 (in round figures); the leasehold was valued at $1,200; with good title the land would have been worth $4,000. The court gave the insured a judgment for $2,300 ($3,500 minus $1,200) and provided the title company with an alternative:
In the instant case, the title insurance company has the right to salvage after payment of the full loss. This is true, not only because of the terms of the policy but in order to prevent unjust enrichment to the insured. It may elect to pay the full loss and receive the sixteenth section leasehold, or it may pay the difference between the full loss and the value of the leasehold above set out. [at 900]
The policy issued to plaintiffs by American contains provisions relating to subrogation, discussed below, but no provisions *618 relating to "salvage." Ranchers relied upon such terms (although none were quoted in the opinion covering the right of salvage) and in addition allowed the purchase of the property by the insurer in order to prevent "unjust enrichment." It is difficult to find any enrichment of the insured in Ranchers; if the title company paid the judgment the insured would receive only $2,300 and would own a property worth $1,200, thus being made whole but not being "enriched." Further, Ranchers dealt with a foreclosing mortgagee, one which would not normally object to the authorized "salvage" arrangement. Its sole interest, in the usual case, is to recover monies loaned. Its purchase of the mortgaged property at a foreclosure sale is undertaken, generally, out of necessity and then requires liquidation of the purchased asset. An original purchaser of property is not in the same position. He or she wants the property for personal or business reasons. The concern is use, not recovery of monies invested. The proposition advanced by American to its insured is backward and absurd. It would use its obligation to remove the judgment lien as a club permitting it to acquire title and capture profits resulting from its insured's efforts in improving and selling the lots. This is entirely beyond the expectations of the insured. It is not permitted by any provision in the policy and is a significant breach of American's obligation to deal with its insured in good faith.
American's insistence upon acquiring plaintiffs' title, if countenanced, would not only permit its capture of plaintiffs' profits, but would deny them the opportunity to earn future commissions on the sale of lots in accordance with their agreement. In addition, it would subject the Summontes to suits by the Radostis and others. American's offer would not protect the Summontes against suits by third parties, unknowing purchasers of lots subject to the lien of the judgment. It would interfere with the purchase and financing of the lot upon which the Summontes' house is to be constructed. The scant promise of American to indemnify the plaintiffs does not prevent suits, *619 does not protect against losses until they have occurred and does not define the losses which are covered. It puts the insured in an unattractive and unfair position. The proposal is one which may be imposed upon the plaintiffs only with their consent. American has no right of salvage.

IV. Subrogation
The subject policy expressly provides that American shall be subrogated to the rights and remedies of the plaintiffs in the event it removes the title defect. That right has been recognized in many cases. E.g., Sandler, supra. American would expand the subrogation rule to require the plaintiffs to surrender their lots in return for clearing title; it claims that this is necessary to permit its pursuit of all rights and remedies of the plaintiffs against the Radostis and Franklin Stephen Construction Company. The position is unacceptable. It is not supported by any known theory of subrogation.
When American releases all 16 lots originally purchased by the Summontes from the lien of the judgment, or satisfies that judgment of record (and it must do one or the other), it is entitled to all of the rights acquired by plaintiffs against the Radostis and the Construction Company arising from the purchase of the lots. These include the right to bring suit for breach of the covenant against encumbrances, the right to sue for any misrepresentation concerning title and, in connection with such rights, all remedies which the law provides. Were the company not already possessed of the judgment, it would be entitled to have it assigned upon payment. It may execute upon the judgment. These are the limits of American's subrogation rights; it is entitled to nothing more.

V. Counsel Fees
Plaintiffs seek an allowance of counsel fees in connection with the present action. R. 4:42-9(6) permits an allowance of such fees "in an action upon a liability or indemnity policy of insurance, in favor of a successful plaintiff." Plaintiffs are covered by the rule; they are successful and are entitled to reasonable fees as well as costs. No equitable principle denies *620 recovery of fees; American was not justified in litigating the plaintiffs' claim. See Miller v. N.J. Insurance Underwriting Association, 177 N.J. Super. 584 (Law Div. 1980). Counsel's affidavit of services reflects an expenditure of 23.75 hours in connection with this action; fees are sought at the rate of $85 an hour, a total of $2,018.75. The request is reasonable. Fees of $2,018.75 are allowed, together with costs.
American has filed a cross-motion seeking dismissal of the count in the complaint which contains the demand for counsel fees, on the technical basis that it should not have been set forth as a separate claim. That motion is of no moment in view of this decision; it is denied.

VI. Conclusion
American is required to satisfy the judgment of record or release all 16 lots from its lien. It is required to pay counsel fees and costs as allowed. These actions must be accomplished within 30 days.
The complaint demands damages. In the event such damages are sought in addition to the satisfaction of the judgment or the release of the lots, that issue will have to be tried; otherwise a final judgment may be submitted by counsel for plaintiffs.